THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JORDAN PICKET PIN, | ) | 4:05CV3019 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| THE BURLINGTON NORTHERN | ) | |
| AND SANTA FE RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Jordan Picket Pin, who is American Indian, filed this action against his employer, the Burlington Northern and Santa Fe Railway Company ("BNSF"), alleging racial discrimination under Title VII, 42 U.S.C. § 2000e-3, and 42 U.S.C. § 1981. (Filing 18, Amended Complaint.) Specifically, Picket Pin claims he was discriminated against, suffered harassment and a hostile work environment, and was retaliated against due to his race when BNSF denied him training, increased his work assignments on two occasions, abolished one of his positions, disciplined him for sleeping on the job, and allowed "Indian chanting sounds" to occur over the BNSF work radio.

Defendant BNSF has filed a motion for summary judgment (filing 33) and a motion for leave to submit a supplemental reply brief (filing 39). For the reasons that follow, I shall grant the defendant's motion for summary judgment.

# I. STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Such a showing shifts to the non-moving party the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Further, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party—here, the plaintiff—"must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 242, 252 & 256-57. While I must view the facts in a light most favorable to the plaintiff, "'mere allegations which are not supported with specific facts are not enough to withstand [a] motion' for summary judgment." Baucom v. Holiday Companies, 428 F.3d 764, 768 (8th Cir. 2005) (quoting Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999)).

## II.  FACTS

I find the undisputed material facts to be these:[1]

1.     Picket Pin is a Lakota and considers himself to be Native American.  He has been employed with BNSF in the mechanical facility in Alliance, Nebraska, since 1998.  BNSF is a Delaware corporation.  (Filing 18 ¶ 5; Filing 20 ¶ 6; Filing 35, Ex. 2D, 17:12-16, 22:8-23.)[2]  Since Picket Pin began working for BNSF, at least two of his supervisors "found him to be an outstanding performer" and a "good worker." (Ex. 5 ¶ 2 & Ex. 6 ¶ 7.)

2.     A mechanical laborer works in the shop, the pit area, or the yards.  The shop is where locomotives are repaired at the mechanical facility in Alliance.  A mechanical laborer assigned to the shop could be assigned to be a motor mover, a position which includes moving the locomotives around and pulling the locomotives in and out of the shop.  A mechanical laborer assigned to the shop could also be assigned to clean the shop or haul parts.  (Ex. 2D, 27:10-29:13.)

3.     A mechanical laborer assigned to the pit could be assigned to clean cabs, fuel the locomotives, put sand in the locomotives, or work on the wash rack.  (Ex. 2D, 31:6-34:10, 38:11-39:3.)

---

[1]Because the plaintiff has not included in his brief "a concise response to the moving party's statement of material facts" addressing "each numbered paragraph in the movant's statement," I considered the properly referenced material facts contained in the defendant's statement of facts admitted by the plaintiff.  NECivR 56.1.

[2]In the factual section of this memorandum and order, exhibits that are cited without a filing number can be found in Filing 35.

3

4.      A mechanical laborer assigned to the yards could be a coach cleaner, DOT laborer/utility coach cleaner (hereinafter "DOT laborer"), or 400 laborer.  (Ex. 2D, 31:3-9.)  A DOT laborer would fill the cabs with diesel and clean the cabs and was assigned to cover the south yards.  (Ex. 2D, 69:17-70:2, 71:1-4.)  The coach cleaner position would cover the north yards.  (Ex. 2D, 71:4-6.)  The 400 laborer was a separate position than the coach cleaner jobs.  (Ex. 2D, 71:7-11.)

5.      For approximately three of his years with BNSF, Picket Pin worked as a floater who was not assigned to a permanent position, but would hold a variety of mechanical laborer positions for two weeks or less.  (Ex. 2D, 43:5-45:6.)  Picket Pin has also bid into permanent positions a few times and had held those positions until he bid out of the position or was bumped by someone with more seniority.  (Ex. 2D, 38:8-19, 41:6-42:1.)  Picket Pin is currently holding a motor mover position, which requires him to move locomotives in and out of various areas.  (Ex. 2D, 48:7-9, 53:24-54:7.)

## A.  DOT Laborer Position & CDL Training

6.      In the past, BNSF has had a DOT laborer position that was responsible for driving fuel trucks to locomotives on the tracks.  Prior to August 2000, an employee was required to have a Commercial Driver's License ("CDL") in order to qualify for this position, and BNSF would pay for the training and licensing.  (Ex. 2D, 53:5-23; Ex. 8 ¶ 4.)  BNSF compared the costs of providing and maintaining the BNSF fuel trucks, training its employees, and obtaining and renewing CDLs for its employees, and determined there would be a cost savings to the BNSF to contract with Quality Rail Services to provide fuel trucks and drivers, and BNSF did so.  After 2000, BNSF has not paid for any BNSF employee to receive CDL training.  (Ex. 8 ¶ 4; Ex. 6 ¶¶ 3-4.)

4

7.     Despite the fact that a CDL was no longer required for the DOT laborer position because of the contract with Quality Rail Services, BNSF continued to post the DOT laborer position as requiring a CDL.  (Ex. 8 ¶ 4; Ex. 6 ¶ 5.)

8.     Picket Pin put a bid in for a "relief" DOT laborer position in early 2003. Although he did not have a CDL, he believed union policy allowed him 30 days to qualify for a position.[3]  (Ex. 2D, 53:18-19, 107:8-19; Ex. 8 ¶ 5.)  A relief position in this instance meant that there was another BNSF employee who held the position full-time, five days a week, and the relief person would hold the position for the two days the full-time employee was off work.  The two days that were open for bid were Monday and Tuesday, third shift.  (Ex. 8 ¶¶ 5 & 6.)  At the same time, Picket Pin asked BNSF foreman John Chizek to provide him with the CDL training he would need to become qualified for the DOT laborer position.  (Ex. 2D, 100:10-101:2, 103:18-105:1-22.)

9.     At the time Picket Pin submitted his application for DOT laborer position, he understood that the BNSF had already entered into a contract with Quality Rail Services to provide drivers for the fuel trucks.  Picket Pin knew that the contractors had been driving the fuel trucks for six months prior to the time Picket Pin put in a bid for the position.  (Ex. 2D, 101:11-102:10.)

10.     Picket Pin was not given the CDL training for the DOT laborer position because the BNSF had made a business decision to contract for the fuel truck and fuel truck drivers, so the CDL certification for BNSF employees was no longer necessary or available.  (Ex. 6 ¶¶ 3-4; Ex. 2D 108:19-20.)  As stated above, no BNSF employee has been provided CDL training at BNSF's expense since August 2000.  (Ex. 6 ¶ 4.)

_____

[3]Standard railroad procedure allows one to "bid" a job, then complete necessary training within a certain amount of time.  (Ex. 2D, 155:5-9.)

5

11.     Picket Pin held the position of relief DOT laborer between February 24, 2003, through April 25, 2003, on Mondays and Tuesdays for the third shift. (Ex. 3 ¶ 4.) During the remaining three days of Picket Pin's work week, he was assigned to other positions. (Ex. 8 ¶ 6.) On or after April 25, 2003, BNSF reassigned Picket Pin from the DOT laborer position to the motor mover position. (Ex. 2D, 110:12-111:4.) There was no difference in pay between the two positions. (Ex. 2D, 111:7-19; Ex. 3 ¶ 4.) BNSF abolished the DOT laborer position on April 30, 2003. (Ex. 8 ¶ 7.)

12.     Picket Pin did not file a grievance over his failure to obtain CDL training. (Ex. 2D, 139:19-25.) The fact that Picket Pin did not receive CDL training has not affected Picket Pin's salary, nor has the fact that he no longer holds the DOT laborer position. (Ex. 2D, 131:15-17; Ex. 3 ¶ 4.)

## B.  Extra Job Assignments

13.     In March 2003, Picket Pin claims he was assigned extra duties when the BNSF was short one of the three laborer positions on the third shift, which is the shift that Picket Pin worked. (Ex. 2D, 95:1-10.) Picket Pin claims he was required to do extra cleaning jobs when employee Brad Dutton, who is not Native American, was not required to do extra work. (Filing 38, Ex. 9A.)

14.     On March 16, 2003, supervisor Wayne Kneebone assigned Picket Pin the two separate jobs of DOT laborer and east yard coach cleaner. Brad Dutton, a white BNSF employee, was assigned to be a 400 laborer, which is one position. (Ex. 2D, 71:12-73:24; Ex. 2A, at 5.) On March 17, 2003, Kneebone assigned Picket Pin the positions of DOT laborer and 400 laborer and assigned Brad Dutton the position of east yard coach cleaner. (Ex. 2D, 73:25-74:5; Ex. 2A, at 5.) On March 18, 2003, Wayne Kneebone assigned Picket Pin to be the DOT laborer and the 400 laborer. Brad Dutton was assigned to be the east yard coach cleaner, but he also helped Picket Pin in the 400s, an arrangement Picket Pin admits was "fair." (Ex. 2D, 76:6-13; Ex.

6

2A, at 5.)   On March 19 and 20, 2003, Picket Pin's days off, he believes three separate employees were assigned to each of the three positions—DOT laborer, east yard coach cleaner, and 400 laborer.  (Ex. 2A, at 5.)  On March 21, 2003, Picket Pin was assigned to perform the DOT laborer and 400 laborer positions, while another employee was the east yard coach cleaner.  (Ex. 2A, at 5.)

15.     After these incidents, Picket Pin said BNSF "finally started filling the position."  (Ex. 2D 95:8-10.)  Picket Pin does not recall if he complained to his supervisors that extra work assignments were being given to him because he is Native American.  (Ex. 2A 95:20-24.)

## C.  Telephone Emergency

16.     On the evening of March 18, 2003, Picket Pin was radioed by supervisor Tom Riley at approximately 12:30 a.m. that he needed to call home, but he needed to finish cleaning the coach before doing so.  (Ex. 2D, 80:13-81:5, 83:14-84:3.) Picket Pin disregarded Riley's instructions and phoned home at once, learning that his brother had been in an accident and was at the hospital.  Picket Pin advised his supervisors he was leaving and went to the hospital.  Upon finding out that his brother was okay, Picket Pin returned to work.  (Ex. 2D, 85:7-87:3.)

17.     On March 18, 2003, Picket Pin had his union representative, Del Ray Beardsley, arrange a meeting with the BNSF general foreman John Chizek to discuss Tom Riley's handling of the phone call from Picket Pin's wife.  (Ex. 2D, 77:4-79:25, 87:7-17.)  Picket Pin does not remember if he alleged at this meeting that the phone call was handled the way it was because he is Native American.  (Ex. 2D, 95:11-19.) Chizek and Riley testified that during the meeting, Picket Pin did not claim that BNSF handled the phone call inappropriately because he is Native American.  (Ex. 6 ¶ 7; Ex. 7 ¶ 6.)

18.     Chizek testified that Picket Pin's telephone incident "was not the first time an employee had experienced a delay in receiving notification of a phone call. The Diesel Tower at the time was processing approximately 100 phone calls and an equal number of radio transmissions at the time of the alleged incident." Chizek has "issued a process to eliminate the delay in processing calls" and, to his knowledge, "this corrected the problem." (Ex. 6 ¶ 7.) Riley admits he did not treat the phone call as an emergency because "[i]t was not explained to me at that time that it was an emergency." (Ex. 7 ¶ 6.)[4]

**D.  Chanting Over Work Radio**

19.     Radios are used by BNSF supervisors to contact employees to give work assignments. (Ex. 2D, 89:14-23.) Not all employees have a radio. There are different radio channels for different areas—shop channels, pit channels, motor mover channels, and train service channels. (Ex. 2D, 82:8-83:13.)

20.     Picket Pin alleges that unidentified coworkers have made "Indian chanting" noises over the radio at the BNSF on an inconsistent basis prior to March 2003 and sporadically after March 2003. (Ex. 2D, 88:8-91:20; Filing 38, Ex. 9A.) Prior to March 2003, the noises would occur "sometimes two or three times a night, sometimes more. Sometimes . . . two, three times every day and then [they would] quit for three, four days." (Ex. 2D, 88:9-14.) At the time of Picket Pin's deposition on October 13, 2005, Picket Pin had not heard the chanting "in a long time." (Ex. 2D,91:19-20.) Picket Pin viewed the chanting as "racial" and "not proper work practice." (Ex. 2D, 97:1-7.) According to Picket Pin, there are four Native Americans who work at the Alliance BNSF mechanical facility. (Ex. 2D, 150:2-12.)

---

[4]Picket Pin's Amended Complaint (filing 18) does not allege that the inappropriate handling of his emergency telephone call is a basis for his claims. I include a discussion of these facts simply because the meeting that followed this incident is discussed in the context of Picket Pin's other claims.

21.     Picket Pin cannot recall whether he addressed the "Indian chanting" at his March 18, 2003, meeting with the union representative and some of his supervisors, but he "believes" he did. (Ex. 2D, 97:12-17, 98:6-9.)  Supervisors John Chizek and Tom Riley, who were at the meeting, both testified that the sole topic discussed at the meeting was the mishandling of the emergency telephone call. (Ex. 6 ¶ 7; Ex. 7 ¶ 6.)

22.     Picket Pin also claims that supervisor Tom Riley called him "chief . . . a few times," although Picket Pin cannot remember when, how many times, or whether he ever complained about it. (Ex. 2D, 98:14-99:15.)[5]

**E.  Sleeping on the Job**

23.     On October 4, 2003, Picket Pin and co-worker Marty Perales were found by supervisor Gayle Tiensvold to be sleeping in a cab during their shift as motor movers. (Ex. 2D, 116:10-119:4.)  Tiensvold awakened both Picket Pin and Perales and reported to his supervisor that Picket Pin and Perales had been observed sleeping "so that they could both be written up on disciplinary charges."  Picket Pin was issued disciplinary charges for sleeping on the job in violation of Rule S-28.11. (Ex. 4A.)

24.     According to Picket Pin, Perales was also "written up" as a result of this incident.  Perales is no longer employed by BNSF, but Picket Pin is not sure whether

---

[5]Picket Pin claimed during his deposition that his brother, who also allegedly works or worked for the BNSF, filed a complaint with the "EEO in Denver" because a coworker called him a "dog eater." (Ex. 2D, 60:9-62:4.)  He also claimed that the person who supposedly made the derogatory remark was not disciplined, but was instead promoted. (Ex. 2D, 146:6-147:19.)  There is no evidence in the record establishing that Picket Pin's brother was employed by the BNSF, that he filed an EEOC complaint for the reasons articulated by Picket Pin, or that the coworker who supposedly made the derogatory remark was promoted.

9

he lost his job because of the sleeping incident.  Perales is not Native American.  (Ex. 2D, 118:14-119:3; Ex. 5 ¶ 4.)   The BNSF supervisor assigned to handle the disciplinary charge against Picket Pin testified that, "I am aware of other employees who have been discharged for sleeping on the job.  There was another non-Native American employee who was also charged with sleeping on the job on October 4, 2003, and his employment was terminated."  (Ex. 4 ¶ 10.)

25.     Also on October 4, 2003, Picket Pin claims to have seen Sandy Watkins, a white employee, sleeping in the pit office where Gayle Tiensvold was "sitting right in front of her, right there in the room with her."  Watkins is a machinist, a different "craft" than Picket Pin's job, but Picket Pin believes Tiensvold was also Watkins's supervisor on that date.  (Ex. 2D, 119:17-121:7, 126:17-127:7, 128:4-6.)  Tiensvold testified that he did not observe Sandy Watkins sleeping on October 4, 2003.  (Ex. 5 ¶ 5.)[6]

26.     On October 24, 2003, Picket Pin waived his right to a formal investigation hearing and accepted a Level S 15-day record suspension and one year probation.   (Ex. 2D, 116:10-21, 125:3-21; Ex. 4B.)   Despite its name, this "suspension" only means that an employee has been found to have committed a serious violation, but a suspension is not actually imposed.  (Ex. 1 ¶ 5.)  That is, "[i]f Picket Pin did not commit another Level S violation in that year following October 24, 2003, he would not suffer any loss in pay, benefits, or change in position."  (Ex. 4 ¶ 7; Ex. 1 ¶ 5.)  Picket Pin has not been "written up" since October 2003.  (Ex. 2D, 149:14-16.)

---

[6]Picket Pin also claims to have "heard about," but not personally observed, several other employees who were sleeping on the job the same night, but were not disciplined.   (Ex. 2D, 121:8-123:18.)   There is no evidence in the record substantiating Picket Pin's claim.

27.     Picket Pin did not tell Gayle Tiensvold he felt he was being treated differently, nor did Picket Pin file a formal complaint with the BNSF against Tiensvold.  (Ex. 2D, 131:3-8.)

## F.  BNSF Harassment Policy

28.     The BNSF has had a Workplace Harassment Policy in place since 1982 which provides a procedure for employees to complain of workplace harassment on the basis of national origin, race, sex, disability, among other things.  The Work Place Harassment Policy requires prompt reporting to the employee's supervisor, department head, human resources representative, equal opportunity personnel, or senior vice president-law. The policy provides for an investigation of complaints, assures confidentiality, prohibits retaliation, and also provides for discipline for violating the policy.  Picket Pin was aware of the Work Place Harassment Policy and has been trained repeatedly on the policy and related issues.  (Ex. 2D, 54:8-58:20 & subexhibit 1; Ex. 2B, at 2.)

29.     Picket Pin did not make a complaint utilizing the Workplace Harassment Policy at the BNSF on any basis.  (Ex. 2D, 61:23-62:1; Ex. 2B, at 4.)  Specifically, Picket Pin admits that he did not "complain[] to a supervisor or a person in human resources" that he "felt [he was] treated differently because of [his] race when the DOT laborer position was eliminated," nor did he complain that he was "called derogatory names by other BNSF Railway Company employees."  (Ex. 2B, at 4.)

30.     Picket Pin filed a charge with the Nebraska Equal Opportunity Commission on July 9, 2003, alleging that, because of his Native American heritage, he was denied training at BNSF, his position as DOT laborer was abolished, he was assigned extra cleaning jobs, and he was subjected to "Indian chanting sounds" over the work radio.  (Filing 38, Ex. 9A.)  He filed an amended charge on November 20, 2003, adding the allegation that he was "written up" on October 4, 2003, for sleeping

11

on the job when other non-American Indian employees who were sleeping were not disciplined.  (Ex. 2D, 150:24-151:9; Filing 38, Ex. 9B.)

## III.  ANALYSIS

### A.  Discriminatory Treatment Based on Race

Picket Pin brings both Title VII and § 1981 claims.  "The elements of a Title VII disparate treatment claim and a § 1981 claim are identical."  Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1997).  Because Picket Pin relies upon circumstantial evidence of discrimination, his Title VII racial discrimination and § 1981 claims may both be resolved by using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

To make a prima facie showing of racial discrimination, the plaintiff must prove (1) that he is a member of a protected group; (2) that he was meeting the legitimate expectations of his employer; (3) that he was subjected to an adverse employment action; and (4) that circumstances exist which give rise to an inference of discrimination.  Wheeler v. Aventis Pharmaceuticals, 360 F.3d 853, 857 (8th Cir. 2004).  "Once the plaintiff has established a prima facie case, the employer has the burden of explaining its actions with legitimate, nondiscriminatory reasons.  If the employer puts forth legitimate reasons for its actions, the burden shifts back to the plaintiff to show that the employer's stated reasons were a pretext for discrimination."  Whitley v. Peer Review Systems, Inc., 221 F.3d 1053, 1055 (8th Cir. 2000) (internal citations omitted).

Here, the defendant does not dispute that Picket Pin is a member of a protected group.  (Filing 34, Br. Supp. Def.'s Mot. Summ. J. at 13.)  Further, there is evidence that BNSF considered Picket Pin to be a hard worker and good employee,

establishing that (with the exception of the sleeping-on-the-job incident) Picket Pin met BNSF's legitimate expectations.

However, Picket Pin's prima facie case of racial discrimination fails at the third element—specifically, that he was subjected to an adverse employment action when he was denied CDL training, when his DOT laborer position was abolished, when he was occasionally assigned extra cleaning duties, and when Picket Pin was "written up" for sleeping on the job.

> An employee suffers an adverse employment action when there is a "tangible change in duties or working conditions" constituting "a material employment disadvantage." Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003) (citation omitted). Our decision in Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999), provides:
>
> > The adverse employment action must be one that produces a material employment disadvantage. Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action, however.

Baucom v. Holiday Companies, 428 F.3d 764, 767 (8th Cir. 2005) (citations and quotations omitted).

The evidence establishes that Picket Pin's salary was not diminished by virtue of his failure to receive CDL training or the fact that BNSF abolished the DOT laborer position which Picket Pin held. There is no evidence that Picket Pin was terminated, constructively discharged, disadvantaged, or that his future career

13

prospects were affected in any way by his lack of training or by his move to another position within BNSF. Further, the fact that Picket Pin occasionally received extra cleaning jobs is simply a "minor change[] in duties or working conditions that cause[s] no materially significant disadvantage" and does not constitute an "adverse employment action." Id.

With regard to Picket Pin's claim that he was disciplined for sleeping on the job when other non-Native American employees were not, he has failed to make a prima facie case of racial discrimination because he has not established (1) that he was meeting BNSF's legitimate expectations when he was sleeping while on duty and (2) that he suffered an adverse employment action when he was disciplined. Picket Pin admits that he was in "a reclined position with [his] eyes closed on October 4, 2003, while working" (Ex. 2B, at 2) and that such conduct is "against the rules." (Ex. 2D, 116:10-18; Ex. 4A, BNSF Employee Safety Rules ("Employees must not sleep while on duty. Employees reclined with their eyes closed will be in violation of this rule.").) Further, Picket Pin did not suffer an adverse employment action when he was disciplined because he did not commit another "level S violation" at BNSF in the year following October 4, 2003, so he was not actually suspended. Nor did he suffer a loss in pay, benefits, or change in position. (Ex. 1, Decl. Thomas Rohling ¶ 5 ("If the employee does not commit a second serious violation of the BNSF's work rules during that year of probation, there is no effect on the employee's employment.".)

Even if Picket Pin had established a prima facie case of race discrimination, BNSF has presented evidence of legitimate, nondiscriminatory reasons for its actions—specifically, BNSF has not paid for any of its employees to receive CDL training since August 2000 when BNSF decided it would be more economical to contract with Quality Rail Services to provide fuel trucks and drivers to locomotives on the tracks; BNSF did not deprive only Picket Pin of the opportunity to work in the DOT laborer position on third shift, but rather abolished the DOT laborer position altogether on third shift; and BNSF was short on employees the few days in March

14

2003 when Picket Pin was assigned extra duties.  As to the sleeping incident, BNSF has filed evidence establishing that it disciplined or terminated the only two employees supervisor Gayle Tiensvold saw sleeping on the job on October 4, 2003—plaintiff Picket Pin and Marty Perales, who is not Native American—and that sleeping on the job is a violation of BNSF rules subject to disciplinary action.

Picket Pin has presented no evidence showing that BNSF's legitimate, nondiscriminatory reasons for its actions are actually a pretext for unlawful discrimination, and thus Picket Pin has failed to raise a triable question of material fact as to pretext.

> In St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), the Supreme Court made clear that "a reason cannot be proved to be 'a pretext for discrimination ' unless it is shown both that the reason was false, and that discrimination was the real reason." As the district court held, [Picket Pin] "failed to bring forth evidence from which a reasonable jury could find that the real reason for his [treatment] was racial bias." . . .  O'Sullivan v. Minnesota, 191 F. 3d 965, 969 (8th Cir. 1999)."

> Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 550-51 (8th Cir. 2005).

Thus, I shall grant summary judgment in favor of BNSF on Picket Pin's claim of racial discrimination.

## B.  Retaliation

Picket Pin next claims that BNSF retaliated against him "for complaints [he] had made concerning the chanting over the radio" by eliminating his position of DOT laborer and by disciplining him for sleeping on the job.  (Ex. 2A, at 6.)  He asserts that his complaint to supervisor John Chizek regarding the "Indian chanting" on the work radio was "protected conduct" for which he was retaliated against.  (Id. at 6-7.)

15

In order to establish a prima facie case of retaliation, Picket Pin must show that he was engaged in protected activity, that BNSF took adverse action against him, and that there was a causal connection between the two actions.  Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1028 (8th Cir. 2004).

> Each action claimed to be retaliatory must be sufficiently adverse to have created a material change in the employment, "such as a change in salary, benefits, or responsibilities."  LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001).  Not everything that makes an employee unhappy constitutes an actionable adverse employment action. Id.  A negative employment review, for example, is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment. Spears v. Mo. Dep't of Corr. & Human Resources, 210 F.3d 850, 854 (8th Cir. 2000).  Minor changes in duties or working conditions that do not result in materially significant disadvantage "do not meet the standard of an adverse employment action . . . ."  Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999).

Henthorn, 359 F.3d at 1028.

As with Picket Pin's claim of racial discrimination, discussed above, Picket Pin has failed to make a prima facie case of retaliation because he has not established that the elimination of his DOT laborer position and the discipline he received for sleeping on the job constitute "adverse employment actions."  As stated above, Picket Pin's salary was not decreased when BNSF abolished the DOT laborer position on third shift.  There is no evidence that Picket Pin was terminated or constructively discharged from BNSF, or that his future career prospects were affected in any way by his move to another position within BNSF.

Picket Pin did not suffer an adverse employment action when he was disciplined for sleeping on the job because he did not commit another "level S violation" at BNSF in the year following the sleeping incident, so he was not actually

16

suspended, nor did he suffer a loss in pay, benefits, or change in position.  There is also no evidence that BNSF used Picket Pin's "suspension" as a basis to detrimentally alter the terms or conditions of Picket Pin's employment in any way.

As discussed above in the context of Picket Pin's racial discrimination claim, even assuming Picket Pin established a prima facie case of retaliation, BNSF has offered legitimate, nondiscriminatory reasons for moving Picket Pin to another job from his DOT laborer position and for disciplining him, and Picket Pin has failed to present any evidence that BNSF's explanations are pretextual.  Henthorn, 359 F.3d at 1028.  I shall therefore grant summary judgment in favor of BNSF on Picket Pin's retaliation claim.

## C.  Racially Hostile Work Environment

To establish a prima facie case of race-based hostile work environment, the plaintiff must show:  (1) he is a member of a protected group; (2) he was subjected to unwelcome race-based harassment; (3) the harassment was due to membership in the protected group; (4) the harassment affected a term, condition, or privilege of his employment; and (5) insofar as co-worker harassment was involved, the plaintiff's employer knew or should have known of the harassment and failed to take proper remedial action.  Singletary v. Missouri Dep't of Corrections, 423 F.3d 886, 892 (8th Cir. 2005); Tatum v. City of Berkeley, 408 F.3d 543, 550 (8th Cir. 2005).  To prevail, Picket Pin must show "both that the offending conduct created an objectively hostile work environment and that [he] subjectively perceived h[is] working conditions as abusive."  Bowen v. Missouri Dep't of Social Servs., 311 F.3d 878, 883 (8th Cir. 2002) (internal citation and quotation marks omitted).

"To decide whether a work environment is objectively offensive, that is, one which a reasonable person would find hostile or abusive, we examine all the circumstances, including the frequency of the discriminatory conduct, its severity,

whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Singletary, 423 F.3d at 892-93.

> "To satisfy the high threshold of actionable harm, [[the plaintiff] must show that] his workplace was permeated with discriminatory intimidation, ridicule, and insult." Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir.2003) (internal citations and quotations omitted). "[M]ere utterance of an . . . epithet that engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment" to give rise to a triable hostile work environment claim." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006).

The Eighth Circuit Court of Appeals has held that racial slurs alone do not render a work environment hostile as a matter of law; rather "such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile." Singletary, 423 F.3d at 893.

> "Under our case law, the racial slurs did not render the work environment . . . objectively hostile. For example, . . . we held six instances of racially derogatory language from managers and coworkers over the course of a year and a half, together with burning cross graffiti, did not render the workplace objectively hostile. Although managers and coworkers said, 'that damn nigger,' 'damn black,' 'nigger s* *t, radio,' 'nigger-rigging,' and 'f* * *ing nigger,' we pointed out two of the comments were not made to the plaintiff, two were not referring directly to him, and another was made in the heat of an altercation involving threats by the plaintiff."

Singletary, 423 F.3d at 893 (quoting Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004)).

Picket Pin testified in his deposition that his coworkers have made "Indian chanting" noises over the radio at the BNSF on an inconsistent basis prior to March 2003 and sporadically after March 2003.  (Ex. 2D, 88:8-91:20; Filing 38, Ex. 9A.)  Prior to March 2003, the noises would occur "sometimes two or three times a night, sometimes more.  Sometimes . . . two, three times every day and then [they would] quit for three, four days."  (Ex. 2D, 88:9-14.)  At the time of Picket Pin's deposition on October 13, 2005, Picket Pin had not heard the chanting "in a long time."  (Ex. 2D,91:19-20.)  Picket Pin also claims that supervisor Tom Riley called him "chief" a "few times."  (Ex. 2D, 98:14-99:15.)

Assuming the "Indian chanting" was directed at Picket Pin and not one of the other three Native Americans who work at the Alliance BNSF mechanical facility, I cannot conclude that use of these offensive utterances created an objectively hostile work environment as a matter of law.  While making "Indian chanting" noises and calling a Native American employee "chief" in the workplace on an inconsistent and sporadic basis is undoubtedly insensitive, immature, and indicative of a lack of intelligence, these racial slurs simply do not meet the high threshold of actionable harm.   Picket Pin understandably construed these remarks as "racial" and inappropriate, but he has not shown that his workplace was "permeated with discriminatory intimidation, ridicule, and insult" such that the very conditions of his employment were altered. Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir. 2003) (internal citations and quotations omitted).  Picket Pin has not established that the chanting and name-calling occurred on a frequent basis, was severe, was physically threatening, or unreasonably interfered with his work performance.  Thus, summary judgment must be granted in favor of the defendant on Picket Pin's hostile work environment claim.  Canady, 440 F.3d at 1035 (mere utterance of epithet that offends employee does not sufficiently affect conditions of employment giving rise to a triable hostile work environment claim).

## IV.  CONCLUSION

For the reasons stated above, I shall grant the defendant's motion for summary judgment on all of the plaintiff's claims.  I shall deny the defendant's additional motion for leave to submit a supplemental reply brief because the defendant filed the motion one month after it filed its initial reply brief, and because the proposed supplemental reply brief simply directs the court to its own local rules and does not assist the court in any way.

IT IS ORDERED:

1.     The defendant's Motion for Leave to Submit Supplemental Reply Brief (filing 39) is denied;

2.     The defendant's Motion for Summary Judgment (filing 33) is granted;

3.     Judgment shall be entered by separate document in favor of the defendant and against the plaintiff, providing that the plaintiff shall take nothing and this matter is dismissed with prejudice.

April 27, 2006.

BY THE COURT:
s/ *Richard G. Kopf*
United States District Judge

20